IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RICHARD A. HOEHNS, §
§
    Plaintiff, §
§
V. § CIVIL ACTION NO. H-05-1703
§
JOANNE B. BARNHART §
COMMISSIONER OF THE SOCIAL §
SECURITY ADMINISTRATION, §
§
    Defendant. §

**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

    Before the Magistrate Judge[1] in this social security appeal is Defendant's Motion for Summary Judgment (Document No. 9), and Memorandum in Support (Document No. 10), and Plaintiff's Motion for Summary Judgment (Document No. 7). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 9) is DENIED, Plaintiff's Motion for Summary Judgment (Document No. 7) is GRANTED, and the decision of the Commissioner is REMANDED for further proceedings.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on September 16, 2005. (Document No. 11).

## I.  Introduction

Plaintiff, Richard A. Hoehns ("Hoehns"), brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his application for disability insurance benefits ("DIB").  According to Hoehns, substantial evidence does not support the ALJ's decision, and the ALJ, Richard L. Abrams, committed errors of law when he found that Hoehns retained the residual functional capacity ("RFC") for medium work.  (Tr. 18, 19). According to the ALJ, Hoehns could perform his past relevant work as a truck driver and construction foreman. Hoehns seeks an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding his claim for further proceedings.  The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Hoehns was not disabled as a result of his impairments, that the decision comports with applicable law, and that it should, therefore, be affirmed.

## II.  Administrative Proceedings

On October 11, 2002, Hoehns applied for disability insurance benefits claiming that he has been unable to work since October 15, 1996, as a result of back problems, cancer and swelling of the joints.  (Tr. 55-57, 93).  The Social Security Administration denied his application at the initial and reconsideration stages.  (Tr. 26-28).  After that, Hoehns requested a hearing before an ALJ.  (Tr. 41-42).  The Social Security Administration granted his request and the ALJ  held a hearing on September 30, 2003, at which Hoehns' claims were considered *de novo*.  (Tr. 523-574).  On October 31, 2003, the ALJ issued his decision finding Hoehns not disabled.  (Tr. 11-20).  The ALJ found at step one that Hoehns had not engaged in significant gainful activity since his alleged disability onset

date.  He further found that Hoehns had chronic pylori gastritis, which is a severe impairment.  Next, at step three, the ALJ found that Hoehns' impairment was not severe enough to meet or equal any of the listed impairments in the Social Security Regulations, which would require a finding that he was disabled.  At step four, the ALJ concluded that Hoehns retained the residual functional capacity ("RFC") to perform medium work.  The ALJ further concluded that Hoehns could return to his past relevant work as a truck driver and construction foreman, and that he was, therefore, not disabled within the meaning of the Act.

Hoehns sought review by the Appeals Council of the ALJ's adverse decision.  (Tr. 9-10).  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R. § § 404.970, 416.1470.  After considering Hoehns' contentions, including a letter dated January 16, 2002, from Gary J. Prescott, NSO, Disabled American Veterans, and a Decision, dated December 18, 2003, from the Department of Veterans Affairs, (Tr. 521-522), in light of the applicable regulations and evidence, the Appeals Council concluded, on March 11, 2005, that there was no basis upon which to grant Hoehns' request for review.  (Tr. 4-7).  The ALJ's findings and decision thus became final.  Hoehns timely filed his appeal of the ALJ's decision.  42 U.S.C. § 405(g).  The Commissioner has filed a Motion for Summary Judgment (Document No. 9), and  a Memorandum in Support thereof (Document No. 10).   Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 7).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 574 (Document No. 4).  There is no dispute as to the facts contained therein.

### III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits,  is, only: "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  *Id.*  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh  the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision.  *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).   The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found

only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).


## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  *Id.*  § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.*  § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "'incapable of engaging in any substantial gainful activity'."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

20 C.F.R. §§ 404.1520, 416.910, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 564.

Here, the ALJ found at step four that Hoehns, despite his impairment and limitations, could perform medium work. In this appeal, the Court must determine whether substantial evidence supports the ALJ's step four finding. According to Hoehns, substantial evidence does not support the ALJ's step four finding because the ALJ ignored the December 27, 2002, consultative examination by D.P. Sunkara, M.D., which described in detail all of Hoehns' impairments, and that based on the results of the physical examination by Dr. Sunkara substantial evidence does not support the ALJ's finding that Hoehns can perform medium work. According to Hoehns, even

though the consultative evaluation was performed after the date he was last insured, the ALJ erred by not consulting a medical expert to determine whether Hoehns' symptoms related back to the insured time frame, especially where the limitations noted in Dr. Sunkara's report are long standing and did not appear overnight.  In addition, Hoehns contends that the ALJ erred by finding that his diagnosis of Post-Traumatic Stress Disorder was not a severe impairment.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren,* 925 F.2d at 126.  Any conflicts in the evidence are to be resolved by the ALJ, and not the Court.  *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000)(citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

## V.  Discussion

### A.  Objective Medical Facts

The medical records in the instant action reveal that Hoehns has sought treatment for symptoms related to urethritis, Reiters' syndrome, ankle pain, back pain, and abdominal pain. Hoehns is a veteran of the Vietnam war.  Because Hoehns served in the United States military, his medical care primarily has been provided through the Veterans Administration.

The first medical record shows that Hoehns was treated for urethral stricture, midpendulous portion and urethritis in October 1967.  (Tr. 136-137).  In 1972,  Hoehns acquired hyperhidrosis in his feet due to having to wear heavy shoes with poor ventilation.  (Tr. 478).  In 1977, Hoehns was treated for a penile discharge at the urology clinic.  (Tr. 466-470).  In addition, because of Hoehns'

complaints of low back pain and swelling in his hands and feet, he was referred to the Rheumatology

Clinic, where he was diagnosed with Reiter's syndrome.[2] (Tr. 463-464).

In April 1981, Hoehns was stabbed in the abdomen. He underwent an exploratory

laparotomy. During the procedure, the surgeon performed a ligation of bleeders, and repaired an

abdominal wall defect. (Tr. 458-460). According to history section of the post-operative report, this

was Hoehns' second abdominal stab wound. The first was in August 1980. (Tr. 459).

The following year, Hoehns was treated for penile lesions in February and April 1982. (Tr.

454-455).

Hoehns was treated for severe urethral stricture disease in March 1990, April 1990, and May

1990. (Tr. 443-453). Hoehns was treated for a urinary tract infections in 1992 and 1993. (Tr. 438-

442). In December 1993, Hoehns was treated for vision problems. (Tr. 436-437). On March 15,

1995, Hoehns was treated for vomiting. (Tr. 435).

The next series of medical records are from 1999. On August 3, 1999, Hoehns sought

treatment for stomach problems. Hoehns reported that over a two month period he had become

nauseous after eating and had lost weight. (Tr. 434). He was diagnosed with "dyspepsia now with

abdominal fullness, bloating and occasional [nausea/vomiting]." (Tr. 434). In response to Hoehns'

complaints of nausea, he was referred for an Esophagram and Upper GI. The results of the tests

performed on August 17, 1999, showed:

> "no esophageal stricture, mass or ulceration. Moderate hiatal hernia and intermittent
> gastroesophageal reflux. Considerable diffuse thickening of the gastric and duodenal
> folds is nonspecific with long list of differential diagnoses including inflammatory

---

[2] Reiter's syndrome is an inflamation of the joints and tendon attachments at the joints, often
accompanied by an inflamation of the eye's conjunctiva and the mucous membranes, such as those
of the mouth, urinary tract, vagina, and penis, and by a distinctive rash. *The Merck Manual of
Medical Information* Home Edition, 1997, p. 241.

and malignant diseases.  Possibly shallow ulcerations in the duodenum present as well.  Consider endoscopy.  (Tr. 431, 432, 433).

Because of the abnormal test results, as well as Hoehns' complaints of weight loss and nausea, he was referred for a gastrointestinal consultation, which took place on September 10, 1999. (Tr. 420, 427).  The consultation note states:

> UGI had been ordered to evaluate longstanding HX of Dyspepsia/GERD like SXS; His SXS resolved on Lansoprazole, however, UGIS read as diffuse thickened folds of antrum and duodenum; Questionable shallow ulcers and EGD was recommended.
>
> The patient is a heavy smoker, sometime ETOH drinker; is not taking NSAIDS; Had abdominal surgery in the past for trauma.
>
> He is an overweight gentleman in no distress.  His vital signs were normal; he had EGD performed following routine premedications with findings of deformed pylorus; the stomach was distensible and the folds flattened out with air insufflation normally. BSX taken of corpus and antrum and submitted to pathology.
>
> The patient may continue his PPI; he was advised of his findings; if he is positive for H.Pylori he may be treated by his PCP with one of the current H. Pylori regimens. He tolerated the procedure very well and left the [ ] in the company of his wife in good condition.  (Tr. 420).

The pathology report confirmed that Hoehns had "chronic active helicobacter phylori gastritis, severe".  (Tr. 421).

Hoehns, who had a large tender incisional hernia, was evaluated by a surgeon concerning surgical options for a hernia repair. (Tr. 414, 415).  At his next appointment on February 23, 2001, Hoehns advised that he did not want surgery because he "can always push the area back (Tr. 411). Hoehns returned to the VA on March 21, 2001, and was treated for a UTI, and again on May 30, 2001. (Tr.404- 409).  The medical records further show that Hoehns was contacted by the VA about rescheduling his July 20, 2001, appointment.  (Tr. 403).  According to the July 18, 2001, note, Hoehns was upset about the change and "stated this is the third time he has been canceled and he needs to be seen because he is a truck driver and he can not be off to reschedule.  Patient stated he

needs to be seen by a doctor because he has very bad stomach problems that need addressing.  He

will be in July 20, 2001 @ 0800 and will see any doctor available." (Tr. 403).  Indeed, the record

shows that Hoehns was seen on July 20, 2001.  According to the treatment note, Hoehns reported

a "change in stool frequency and consistency with occasional discomfort." (Tr. 402)**.**  On September

4, 2001, Hoehns had an abdomen-kub. The test revealed "DJD.  Large, bridging osteophyte L4-S1

on the left.  Vascular calcifications.  Retained feces.  Inadequate bowel prep.  Patient rescheduled

pending repeat prep."  (Tr. 395, 396).  According to the treatment notes,  Hoehns complained that

"he is not being cleaned out." (Tr. 394).  On September 11, 2001, Hoehns had a colon air contrast.

(Tr. 393).  However, the test was a "[f]airly limited exam due to colon redundancy and retained

feces.  No constricting lesion or definite polyps.  Colonoscopy might be considered."  (Tr. 393).

Hoehns returned to the VA on October 22, 2001, again complaining of abdominal cramping.  (Tr.

390-392).   The treatment notes further show Hoehns called the VA on November 1, 2001, and

complained that he "cannot afford all these appts.  I want to cancel.  Tell my Dr. that I need that test

for my colon ASAP."  According to the treatment note, Hoehns' next appointment was scheduled

for *July 9, 2002*.  (Tr. 389).  The final treatment note for 2001 was on December 28, 2001.  Hoehns

had a mental health triage exam.  (Tr. 388).  According to the mental health triage note, Hoehns had

post traumatic stress disorder.  (Tr. 388).  Thereafter, on February 8, 2002, Hoehns was given

information about the trauma recovery program.  (Tr. 386, 387).

Hoehns called "telecare triage" complaining of vomiting four times and abdominal pain on

February 9, 2002.  Because he could not be seen immediately at the VA, Hoehns sought care at the

Tomball Regional Hospital Emergency Room.  (Tr. 139-143).  The following day, Hoehns was seen

at the VA.  (Tr. 373-383).  Because Hoehns' abdomen was tender and there was radiologic evidence

of a complete small bowel obstruction, an exploratory laparotomy was performed.  Hoehns was

hospitalized from February 11 to February 17, 2002. (Tr. 372-318).   The surgical note reveals that there was the presence of a ventral hernia, and that a twisted loop of the small bowel that had become adhesed into a section of one of the hernias and had adhesions surrounding it.  In addition, "[t]he bowel was decompressed distally from this point and was dilated proximally.  This area was taken down and at this point, the contents of the small bowel were gently milked into the stomach, where it was decompressed with a nasogastric tube.  Further adhesiolysis commenced until we could be sure that there were no further areas of obstruction." (Tr. 368-369).

Notwithstanding the surgery, Hoehns continued to have abdominal pain with bouts of cramping and diarrhea.  He was admitted to the Puget Sound Veterans Hospital but left "AMA." Back in Houston, Texas, Hoehns returned for medical care at the VA.  The results of a CT of the abdomen and pelvis was "suspicious for partial small bowel obstruction." (Tr.272-270).  He also underwent an upper GI. (Tr. 255-258).   In addition, Hoehns had a complete physical examintion. The results of Hoehns' physical examination revealed that he had a full range of motion in his neck, shoulder, elbows, wrists, back, and knees.  As to his ankles, Hoehns had "no effusion, slight bilateral point tenderness [anterior] to [lateral] malleolus, left ankle larger, limited inversion. (Tr. 268).  X-rays showed degenerative changes in spine.  (Tr. 266). Hoehns had a surgical consultation on September 13, 2001. (Tr. 253).  According to the note, Hoehns had "intermittent crampy abdominal pain with occasional emesis.  He is passing bowel movements and flatus...He feels that his symptoms are causing him tremendous difficulty and interfering with his life.  He is unable to work.  He has nearly gone bankrupt because he has been unable to work due to his bowel complaints." (Tr. 253). Again, Hoehns opted for the exploratory laparatomy.  His postoperative diagnosis was cecal mass and adhesions.  (Tr. 224-225, 237-241). On September 19, 2001, a nursing note shows Hoehns suffered from anxiety. (Tr. 227).  The pathology report of the colon specimen showed:

> Moderately differentiated adenocarcinoma.
> Tumor size 2.5 X 2.0 X 2.0 Cm.
> Lymphatic and perineural invasion and noted.
> Metastatic adenocarcinoma in six out of thirteen lymph nodes.
> Ileal and colonic margins of resection, no tumor seen.  (Tr. 222).

The pathologist further wrote:

> The tumor invades through the muscularis propria of the colon into the pericolic
> adipose tissue, and invades the external portion of the muscularis propria of the
> ileum.  Summary of staging: T4 N2.  (Tr. 222).

Thereafter, the Multidisciplinary Tumor Board met to discuss Hoehn's case on October 2, 2002.  (Tr.

195).  A summary of the discussion follows:

> 53-year-old man with abdominal pain and diarrhea for two years, s/p exploratory
> laparotomy and lysis of adhesions and ventral hernia repair with mesh done at an
> outside hospital in 2-02.  Patient felt better for a few months but recently symptoms
> recurred.  CT scan, UGI with SBFT and KUB done here showed partial small bowel
> obstruction.  He underwent an exploratory laparotomy on 9-19-02, which showed a
> large cecal mass at the ileocecal valve, and several adhesions.   A right
> hemicolectomy was performed with primary ileocolic anastomosis.
>
> Pathology revealed a moderately differentiated adenocarcinoma and 6/13 lymph
> nodes were positive.  Pathological state is T4N2M0 and the board recommended
> adjuvant chemotherapy.  Patient also needs a baseline full colonoscopy and f/y CEA
> levels (preoperative CEA was elevated).  (Tr. 195).

Based on the recommendation by the Multidisciplinary Tumor Board, Hoehns had an oncology

consultation on November 1, 2002, at which time his chemotherapy plan was designed and

appointments scheduled.  Hoehns did not miss a scheduled chemotherapy appointment .(Tr. 197-193,

179-180, 158-174).

In addition to receiving chemotherapy, the medical records show that Hoehns complained

of and was treated at the Rheumatology Clinic for complaints of increased knee pain and back pain.

(Tr. 181-182).  X-rays were taken of his spine, pelvis, left ankle and knees.  (Tr. 184-188).  The

radiologist opined:

Bilateral knees: DJD bilaterally.   Minimal narrowing knee joint.   No other abnormality.

Lumbosacral spine: Transitional vertebra L5/S1.  DJD.  Narrowing L5/S1.  Vascular calcification.

Pelvis: DJD both hip joints with moderate narrowing.   Bilateral sacroiliac joint narrowing with some sclerosis.

Left ankle: DJD, narrowing.  No obvious fracture.  (Tr. 183).

A follow- up X-ray of the lumbar spine was performed on November 16, 2002. The x-ray showed "[b]oth the S1 joints are sclerotic and may be fused."  (Tr. 177, 178).  At Hoehn's November 18, 2002, appointment, Hoehns complained of swollen ankles.  According to the treatment note, Hoehns had a "flat foot with abduction deformity of fore foot, hindfoot valgus, equinus contrcture (sic), calcaneal fibular impingement, tender along post-tibial tendon and along fibula, weak inversion strength."  (Tr. 175).

The medical records from 2003 show that Hoehns had several cycles of chemotherapy.  In particular, he had chemotherapy January (Tr. 483-485, 489-490), February (Tr. 494-498), late March/early April (Tr. 501-506) and May (Tr. 511-512).  Also, on January 25, 2003, Hoehns was seen at the Prosthetic Orthotic lab for a fitting for his foot.  (Tr. 485).  Because of Hoehns' complaints of back pain, he was seen numerous times at the Rheumatology Clinic.  For instance, Hoehns was seen on February 24, 2003 (Tr. 445), April 4, 2003 (Tr. 507-510), June 11, 2003 (Tr. 513-515), and July 11, 2003 (Tr. 516-518).

The Department of Veterans Affairs increased the entitlement amount Hoehns receives from the VA based on his service related disabilities.  In a letter dated January 22, 2002, Hoehns was notified by the VA that he was assigned a 10% disability rating for Urethritis with an effective date of November 21, 2000.  (Tr. 67-69, 521).  In a letter dated December 18, 2003, Hoehns was notified

that he was assigned a 40% disability rating for lumbosacral strain with an effective date of November 21, 2000.  (Tr. 522).[3]  Finally, in a letter dated July 19, 2004, Hoehns was notified that he was assigned a 70% disability rating for Post Traumatic Stress Disorder with an effective date of November 21, 2000.  (Document No. 7, Exhibit B).

In connection with Hoehns' application for disability benefits, he was referred for a consultative examination at the Physicians Plus Medical Clinic.  This examination took place on December 13, 2002.  He was examined by D.P. Sunkara, M.D.  (Tr. 144-146).  In connection with this evaluation, X-rays were taken, and the results attached to Dr. Sunkara's report.  (Tr. 147, 148).  The results of the examination of Hoehn's back and extremities show:

> **Back:** Nontender and with normal curvatures.  ROM F: 30, E: 10, RL: 10, LL: 10.  No muscle spasms or atrophies.  CVA is nontender, SLR test is normal bilaterally.

> **Extremities:** Symmetrical, no atrophies seen, joints are nontender and with normal range of movements except right ankle.   No signs of effusions, crepitus, or inflammatory signs were detected.  No edema, clubbing or cyanosis.  Able to pick up and handle small objects, and button and unbutton clothes.

> **Right Ankle:** Ankylosis, no ROM, muscle weakness and atrophy.  Instability of DIP joint in left 3rd finger.

> **X-ray of Left Ankle:** Normal.  Report enclosed.

> **X-ray of Spine:** Lateral bridging osteophytes, L4 and L5.  Disk narrowing, L3-4, L4-5 and L5-S1.  Degenerative Sacroillitis, bilateral.  Small marginal osteophytes, L1 to L3.  Report enclosed.

> **Assessment:** Mr. Hoehns is a 54 year-old male with:

> 1. Carcinoma: s/p right Hemicolectomy with disabling complications such as persistent diarrhea and possible hypokalemia (muscle cramps).

> 2. Ankylosis of left ankle.

---

[3] This letter was included in the materials presented to the Appeals Council.

3.  Severe chronic back pain with DDD and DJD

He is able to sit, stand and move about.  He could lift, carry and handle objects and his hearing and speech are normal.  He alleges pain at a level of 7/10 in back and left ankle and this corresponds with the clinical findings.  ROM diminished in lumbar spine.  He has back pain and loss of motion.  There are joint deformities in left third finger. His grip strength and coordination are normal. He could ambulate effectively without assistive devices.  No hearing loss noted and no evidence of obstruction noted. (Tr. 145-146).

A Residual Functional Capacity Assessment was completed on January 2, 2003.  (Tr. 149-156).  According to the Assessment, Hoehns could occasionally lift and/or carry ten pounds, could frequently lift and/or carry less than ten pounds, could stand and/or walk at least two hours in an eight hour workday, could sit (with normal breaks) for a total of about six hours in an eight hour work day, and had no limitations with pushing and/or pulling.  (Tr. 150).

Hoehns testified at the September 30, 2003, hearing concerning his alleged impairments.  According to Hoehns, he has been unable to work since he injured his back in October 1996.  (Tr. 532-533).  Hoehns testified that he was "changing my oil in my truck and I got underneath the truck and couldn't get out, and couldn't stand up...I was in bed for two days.  After that I just couldn't, you know, I couldn't do anything it seemed like.  My back hurt all the time."  (Tr. 532-533).  Hoehns further stated that he takes hydrocodone for back pain.  (Tr. 533).  Hoehns further testified that his doctor at the VA hospital has not recommend surgery as a treatment option.  (Tr. 542).

In addition to his back problems, Hoehns testified that he has been unable to work due to urinary problems, ankle and wrist swelling, and degenerative joint disease.  (Tr. 534).  As to his ankle swelling, Hoehns testified that his ankle swells and hurts all the time.  According to Hoehns, walking aggravates the pain.  (Tr. 535).  He stated that he wears an ankle brace.  (Tr. 535-536).  With respect to his urinary problems, Hoehns testified that he has strictures in the urethra tube.  (Tr. 536).  Hoehns testified that he has to go to the restroom about every hour on the hour, and that on occasion, has

incontinence. (Tr. 537-538).  According to Hoehns, his joint pain is caused by [Reiter's Syndrome], which has caused arthritis in some of his joints and that it flares up."  (Tr. 536-537).

Also,  Hoehns testified about his history of stomach problems.  According to Hoehns, he has had problems with indigestion all his life.  (Tr. 539).  However, in 1999 it became worse.  (Tr. 539). Hoehns stated he "couldn't keep food down." (Tr. 539).  With respect to this increased stomach pain, Hoehns testified as follows:

Q.  Okay.  Now, what was going on in, let's see here, in July of 2001?  It said – let's see.  You were going in because you had some stomach pain.  Are they referring to something related to your hernia at that point or —

A.  No.

Q.  —did they–

A.  No, my stomach couldn't keep food down, acid reflux.  I've been on Simethicone for, I don't know how many years, you know, off and on.

Q.  Okay.  Well, that —when did– the problem that you had surgery for in February of [2002], where they put a mesh in you.  When did you start having problems that led up to that surgery?  In other words, when did you first know that you were having pain or discomfort or whatever that led to that surgery in February of [2002]?

A.  I believe it started back in the early [1990's].

Q.  Okay.

A.  Maybe late [1980's].

Q.  When did it get bad enough where it started interfering with you–

A.  Well, they couldn't find out what was wrong with me because they wouldn't go in and operate, or you know, check me out, or anything else.  They just kept saying it was acid reflux and things like this and [inaudible] they told me it might have been what caused my cancer too.

Q.  Okay.

A.  All the years of taking all that medicine.  (Tr. 5409-541).

In addition, as to early signs relating to colon cancer, the following exchange took place between

Hoehns and the ALJ:

Q. Okay. That's what I was trying to find out. All right. Now, you also mentioned that you had a pretty severe surgery done on your colon as a result of colon cancer. And you had chemotherapy and all kinds of treatment for that. Do you recall when you first started having a problem that was related to the colon cancer, the very first time when you knew there was something wrong down there? When would that have been, to the best that you can recall?

A. I never did know. My stomach problem has been, like I said, from back in the [1980's] and [1990's] and all up through the years. And they were giving me medicine like for the acid reflux and everything else and that really wasn't it. And that could have been what caused all this. Well, what I was told. You know, it could have been the start of it.

Q. Okay. Was there in a point in time during the years before the surgery where you started having problems with your colon? You had problems going to the bathroom or diarrhea or anything like that that led up to your having to have that surgery and all that?

Q. Oh, yeah.

Q. Do you recall anything like that?

A. I've had times I'd get to where I couldn't eat. I'd get real sick at my stomach if I did eat. And that was back in the [1990's]. Then, you know, they'd give me medicine. I've been on Tagament, Zantac, you know, things like that all along, especially Tagament. And for my stomach, you know, it'd help these problems.

Q. Okay. And if you could for me, I see in January of 2001, this is Exhibit 5F, page 273, you went into the VA and you were complaining of nausea and cramping, abdominal pain, and it said you had soft caliber stools.

A. Um-hum.

Q. Was that something that was ultimately–

A. That was because of the adhesions that had one in and started clamping off my intestines.

Q. Okay. So as far as you know that' s not related to the cancer that you had later?

A. Well—

Q.  If you know.  If you don't know that's okay.

A.  It's probably all connected because you know, that's what they were talking about with my stomach problems earlier in life, you know, in taking all these pills and medicine and everything, that it could have helped contribute to the cancer. (Tr. 542-544).

In addition, Hoehns testified he has six very loose (diarrhea) bowel movements a day.  (Tr. 547).

As to post traumatic stress disorder, Hoehns testified that he has "always had a problem with it."  (Tr. 547).  According to Hoehns, he has "[n]ightmares, loss of sleep, wake up sweating, cold chills."  (Tr. 547).  Finally, Hoehns testified about problems he has with his deformed finger.  (Tr. 548).

As to his functional abilities, Hoehns estimated that he could sit for about two hours but would then need to recline.  (Tr. 549-550).  Also, as for walking, Hoehns testified he could walk a block and could stand five or ten minutes.  (Tr. 550-551).  Hoehns testified that he could bend halfway.  Finally, Hoehns stated he could climb as long as he was holding a handrail.  (Tr. 551).

Lastly, Hoehns testified about his daily activities.  According to Hoehns, he does little house work, yard work, or grocery shopping.  (Tr. 551).  He did, however, testify that he can ride the riding mower until he gets tired or no more than two hours.  (Tr. 552).  Hoehns stated that his hobby is whittling.  (Tr. 559).  Hoehns testified that he carries a cane, even though the VA has not prescribed one, because he does not know when he might have difficulty getting out of a "soft chair".  (Tr. 560).  Overall, Hoehns testified that he cannot work because of his back, diarrhea, and ankle.  (Tr. 561).

**B.  Diagnosis and Expert Opinions**

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been

over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel,* 209 F.3d 448, 455 (5th Cir. 2000)(quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995)). As such, if the treating physician's opinion is deficient in either respects, then it is not entitled to controlling weight. The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id*. "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez,* 64 F.3d at 176. (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). Further, regardless of the opinions and diagnoses of medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez,* 64 F.3d at 176.

Even if an opinion of a treating physician is not entitled to controlling weight because it was not consistent with the other substantial evidence of the record and was not well supported by medically acceptable clinical and laboratory diagnostic techniques, the opinion nonetheless is still entitled to deference and must be weighed in light of the following factors:

(1)  the physician's length of treatment of the claimant,

(2)  the physician's frequency of examination,

(3) the nature and extent of the treatment relationship,

(4)  the support of the physician's opinion afforded by the medical evidence of the record,

(5)  the consistency of the opinion with the record as a whole, and

(6)  the specialization of the treating physician.

*Newton*, 209 F.3d at 456.   "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455.

The ALJ wrote:

Due consideration has been given to credibility, motivation, the objective medical evidence and opinion, clinical and laboratory findings, diagnostic tests, the extent of medical treatment and relief from medication and therapy, the extent, frequency, and duration of symptoms, attempts to seek relief from his symptoms, the claimant's work record and activities of daily living, and all of the evidence of record considered as a whole.  The undersigned United States Administrative Law Judge finds that the claimant's subjective symptoms are of only a mild to moderate degree and tolerable for the level of work, residual functional capacity and work limitations as found herein; and the claimant's subjective complaints are not credible.  In support of this conclusion, the undersigned United States Administrative Law Judge notes that [] although the claimant indicated that he underwent surgery in February 2002 and again in September 2002, those surgeries cannot be considered because they occurred after the claimant's date last insured of December 31, 2001.  Additionally, in July 2001 the claimant reportedly stated that it was the 3rd time he had an appointment canceled and he needed to be seen by a doctor because he was a truck driver and he could not take off to reschedule.  (Exhibit 5F, page 247).

Furthermore, during the relevant period under consideration, there is no documentation regarding any functional limitations as a result of the claimant's complaint's of ankle problems, muscle pain, joint pains, or back problems.  The undersigned United States Administrative Law Judge observed the claimant at the hearing and the claimant was able to sit without apparent distress or pain.  Moreover, the claimant testified that up to the year 2003 he went with his wife on long distance truck trips.  (Tr. 18).

According to Hoehns, the ALJ erred by ignoring the consultative examination by Dr. Sunkara, which suggests that Hoehns cannot perform medium work, and by ignoring the rating issued by the VA relating to disability based on urethritis, lumbosacral strain, and PTSD, all of which were given

an effective date of November 21, 2000, which was a year before the date he was last insured. Hoehns argues that the ALJ should have considered a retrospective diagnosis, and should have sought the assistance of a medical expert. In response, the Commissioner contends that the ALJ properly assessed Hoehns' RFC for the relevant time period, namely, the period of time before December 31, 2001, or the date he was last insured, and that based on those medical records, Hoehns could perform medium work and was not disabled within the meaning of the Act. According to the Commissioner, any subsequent records, which suggest a potentially severe impairment such as Hoehns' subsequently diagnosed colon cancer are not relevant. Moreover, the Commissioner argues that Dr. Sunkara's examination does not explicitly state nor does his opinion establish that Hoehns was disabled prior to the expiration of his insured status.

Here, Hoehns' Title II insured status expired on December 31, 2001. "A claimant is eligible for benefits only if the onset of a qualifying medical impairment [or combination of impairments] began on or before the date the claimant was last insured." *Lozz v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000). "[R]etrospective medical diagnoses may constitute relevant evidence of pre-expiration disability, and that properly corroborated retrospective diagnoses can be used to establish disability onset dates." *McClendon v. Barnhart*. (No. 05-40366), 2006 WL 1662790 (5th Cir. June 9, 2006). As such, Hoehns, to be eligible for benefits, had to establish that he became disabled on or before December 31, 2001. Otherwise, "[e]vidence showing a degeneration of a claimant's condition after the expiration of his Title II insured status is not relevant to the Commissioner's Title II disability analysis." *Barraza v. Barnhart*, 61 Fed. Appx. 917, 2003 WL 1098841, at * 1 (5th Cir. 2003) (citing *Torres v. Shalala*, 48 F.3d 887, 894 n.12 (5th Cir. 1995)). " However, an ALJ may not refuse to consider retrospective medical dignoses uncorroborated by contemporaneous medical reports but corroborated by lay testimony." *Id.* (Citing *Likes v. Callahan*, 112 F.3d 189, 190-191 (5th Cir.

1997)).  In addition, "precise contemporaneous medical records are not always a prerequisite to establishment of a disability onset date." *McClendon*, at *1 (citing to *Ivy v. Sullivan*, 898 F.2d 1045, 1049 (5th Cir. 1990)).

Here, the ALJ found that Hoehns had a severe impairment, H pylori.  Although Hoehns had alleged disability based on cancer, back pain, and joint swelling, he was not diagnosed with and treated for cancer until 2002.  The ALJ did not consider Hoehns' surgeries in 2002 because they occurred after the date he was last insured.  However, when Hoehns was diagnosed with colon cancer, his cancer was in an advanced state, which suggests that it had not developed over night. Similarly, x-rays taken in connection with Dr. Sunkara's consultative evaluation and the results of Dr. Sunkara's examination showed ankylosis of the ankle, and with respect to his back, degenerative disc disease and degenerative joint disease.  Again, these medical problems did not develop over night.  Upon this record, it was error for the ALJ to disregard the consultative examination by Dr. Sunkara and all the medical records post December 31, 2001.  Here, Hoehns testified not only about his current condition but also about the onset of his symptoms.  For example, he testified about his history of stomach problems (Tr. 539, 542-544, 547), back problems (Tr. 532-533, 542), bladder problems (Tr. 537-538), ankle pain (Tr. 534-536), and PTSD (Tr. 547).  Moreover, Hoehns' testimony concerning his history of stomach problems was corroborated by the medical records.  For instance, in 1999, a GI taken on August 17, 1999, showed "considerable diffuse thickening of the gastric and duodenal folds is nonspecific with a long light of differential diagnoses including inflammatory and *malignant* diseases."  (Tr. 434) (emphasis added).   In 2001, Hoehns complained about increasing pain and reported a "change in stool frequency and consistency with occasional discomfort."  (Tr. 402). Moreover, Hoehns was upset about his appointments being canceled and reported "very bad stomach problems that need addressing."  (Tr. 403).  The record further shows repeated unsuccessful attempts

by Hoehns to clear his bowels, which resulted in fairly limited colon exams, and that as of November 1, 2001, Hoehns' next available appointment for a colon test was not until July 9, 2002.  (Tr. 389). The ALJ made no attempt to infer the onset date from the available records, did not consider the history and symptoms of the disease process, did not consult a medical advisor to assist him in inferring an onset date and did not seek additional information from any of Hoehns' physicians at the VA.  In addition, neither the ALJ or later the Appeals Council discussed the disability ratings for PTSD, lumbosacral strain or urethritis that Hoehns had received from the VA.  All the ratings had an effective date of November 21, 2000.  "A VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different, but it is evidence that is entitled to a certain amount of weight and must be considered by the ALJ." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (citing *Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000).  Therefore, the matter should be remanded for further development of the record.

### C.  Subjective Evidence of Pain

The third element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook v. Heckler,* 750 F.2d 391, 395 (5th Cir. 1985).  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.

42 U.S.C. § 423(d)(5)(A).  "Pain constitutes a disabling condition under the [SSA] only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 860 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

Given that the matter should be remanded for further development of the record, and because the credibility assessment is inextricably intertwined with the expert opinion factor, this factor neither weighs in favor of or against the ALJ's determination.

### D.  Education, Work History and Age

The fourth element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial  gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that Hoehns was fifty-five years old at the time of the hearing, and had completed high school.  His past relevant work experience was as a truck driver and construction foreman.  The ALJ questioned Richard J. Ruppert, a vocational expert ("VE"), at the hearing about Hoehns' ability to do his past work and his ability to engage in other gainful work activities.  "A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific  requirements of

a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995)(quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala,* 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling v. Halala*, 36 F.3d 431, 436 (5th Cir. 1994).

Given that the matter should be remanded for further record development, including a new RFC assessment and credibility assessment, on remand, the ALJ should reconsider Hoehns' ability to perform any work.

## V.  Conclusion

Based on the foregoing, and the conclusion that further development of the record is necessary, and that based on these infirmities in the ALJ's opinion substantial evidence does not support the ALJ's decision, the Magistrate Judge

ORDERS that Defendant's Motion for Summary Judgment (No.9), is DENIED, Plaintiff's Motion for Summary Judgment (Document No. 7) is GRANTED, and that this case is REMANDED to the Social Security Administration pursuant to 42 U.S.C. §405(g), for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 21st  day of  July,  2006.

Frances H. Stacy
United States Magistrate Judge